(No. 4950— )

NORTHWESTERN NATIONAL INSURANCE COMPANY OF MILWAUKEE, WISCONSIN and STANDARD INSURANCE COMPANY OF NEW YORK, A Corporation, subrogees of WILLIAM SCHWARTZ and FRANCES SCHWARTZ, Claimants, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed January 8, 1963.*

ABNER GOLDENSON, Attorney for Claimants.

WILLIAM G. CLARK, Attorney General; HAROLD A. COWEN, Assistant Attorney General, for Respondent.

PERLIN, J.

Claimants bring this action as subrogees of William Schwartz and Frances Schwarz for damages caused to real and personal property owned by said subrogors at 1445 Talcott Road, Park Ridge, Illinois, on December 6, 1958, when a Del Mar aerial target fell from an airplane operated by a member of the Illinois National Guard.

Claimant, Standard Insurance Company, who had insured the real property, paid the sum of $593.43 for its repairs, and Northwestern National Insurance Company paid the sum of $129.90 for damages to the personal property contained therein. Claimants bring this action under the subrogation provisions of the insurance policies issued by them, and seek reimbursement for the amounts paid the insureds.

Claimants contend that respondent, through its agents, members of the Illinois National Guard, was negligent in the operation, control and maintenance of the aircraft and the Del Mar target attached thereto.

The parties have stipulated that, on December 6, 1958, an airplane operated by the Illinois National Guard was pulling a Del Mar target in the general area of Park Ridge, Illinois. They have also stipulated that, if the State is found liable, the amounts requested by claimants in this proceeding represent the actual damage sustained.

William Schwartz, the owner of a ranch-type house located at 1445 Talcott Road, Park Ridge, Illinois, testified as follows: He and his wife had left their home on Talcott Road about 11:00 A.M. on December 6, 1958. At that time the building and contents of the house were in good condition. They returned about 1:00 P.M. that same day and found insulation, plaster and debris spread all over the living room. Mr. Schwartz immediately ran outside, and saw what appeared to be a rocket protruding from the roof of his home. Schwartz called the police, who noticed the telephone number of O'Hare Field on the protruding object.

Schwartz then called O'Hare Field, and about fifteen minutes later several men in uniform arrived, and removed the object, later identified as a Del Mar target, from the roof. Upon further inspection, Mr. Schwartz found part of the target lying outside the house. Pictures of the target and damage to the building and contents were taken by officers from O'Hare Field, and copies were introduced into evidence by claimants.

Mr. Schwartz further testified that the officers tried to clean up the damage, and that someone came over to cover the hole in the roof temporarily.

The following day, in response to a call from O'Hare Field, Mr. and Mrs. Schwartz visited the Field, and were shown the plane involved in the accident, and the cable which had been attached to the target. The cable had been taken apart, and was being examined to determine the cause of the break.

Respondent introduced the testimony of three witnesses. These witnesses described the nature of the target as follows: That it is made of fiberglass, and fits into a cone-shaped "ring" called the "basket", which is put into a position off the wing of the plane; that the cable to which the target is attached is made of high tensile steel, and is .034 inches in diameter and some 8,000 to 9,000 feet long; it is operated by a propeller, and held in check by an electrical brake; that the cable extends from the basket out on the wing through a series of pulleys; that there is no warning light to indicate when the cable is extended, but there is a counter in the cockpit, which indicates the number of feet the cable is extended.

Respondent's first witness was Major Thomas W. Alles, the pilot of the plane in question. He testified that, shortly after take-off for a scheduled low target mission, he noticed a warning light on the instrument panel indicating a malfunction of the landing gear. He continued to orbit the airport while checking the condition of the aircraft, and just east of the airport he glanced around to check traffic. He noticed the Del Mar target, which is a large red object, flapping violently off on the right hand side of the aircraft. He stated that "before we could take any action, the Del Mar broke loose and left the airplane." One of the interceptor airplanes taking part in the maneuvers viewed the aircraft aloft, but saw no visible damage. There was about ten feet of cable trailing out of the basket, which was retracted, and the plane continued its mission.

Major Alles testified that before taking off he examined the basket for tightness, checked to make certain that the target fit snugly, and checked the cables to see if they were taut. He did not inspect the reel mechanism nor the brakes, because these mechanisms are hidden.

The Major said that in the instant case the target had extended some way by itself, and was approximately ten feet past the end of the plane at the time he first noticed it. He further testified that the actual cause of the target falling was a rupture of the cable, and that the target apparently extended without his releasing it due to some defect in the mechanism, probably a slipping of the brake.

Major Alles also said that he was accompanied by a second pilot on the mission, Captain John Sheedy. Captain Sheedy was not called to testify, but his statement was included in a Departmental Report filed with the Court. His report states that he was scheduled to operate the target towed by the plane, but that a malfunction of the gear took his attention, and he was reading through the check list of gear operations when the mishap occurred.

Respondent then introduced testimony of National Guard Quality Control Supervisor Leonard Cox as to the inspection routine usually followed, but he could produce no evidence as to any inspection made on this particular flight. Sergeant Cox said that there were periodic inspections of the target and reel, but he had no knowledge of when such check was made on the plane in question. Sergeant Cox did not produce any records of alleged checking, explaining that the records are required to be kept only six months, and that more than two years had elapsed at the time of this hearing.

Sgt. Michael Calzaretta, a Radar Mechanic for the Illinois National Guard, testified for respondent. He stated that he had examined the aircraft after the accident, but knew nothing about its inspection prior to take-off. He said that the end of the cable was frayed, and that there was tangled material, which was snipped off so it would be ready for service again. He stated that

the break in the cable occurred 5 or 6 feet from the end of the wire, and that on the usual pre-flight inspection the reel is drawn out and 150 or so feet of cable is snipped off. Sergeant Calzaretta further stated that no inspection is made of the brake after the safety pin is removed prior to flight, but that a slight entanglement in the wire within the reel itself could have caused the target to be released, as well as a partial release of the brake. He did not personally know if anyone had made a pre-flight inspection.

There is obviously no question of contributory negligence in this case.

Respondent contends that claimants have failed to show any specific negligence on the part of respondent, and have not proved their case by a preponderance of the evidence.

In the opinion of this Court, the doctrine of *res ipsa loquitur* is properly invoked by claimant. In *Charles M. Kenney, Administrator*, vs. *State of Illinois*, 22 C.C.R. 247, 257, the Court stated:

"Under the maxim 'res ipsa loquitur', our courts have announced many times that where a thing, which has caused injury, is shown to be under the management of the party charged with negligence, an accident is such as in the ordinary course of things does not happen, if the management uses proper care. The accident itself affords reasonable evidence, in the absence of an explanation by the party charged, that it arose from want of proper care."

In the Kenney case, a tree limb on the Illinois State Fair Grounds fell, killing a pedestrian. Respondent's evidence that it did not know the condition of the tree, and that it kept a crew, which inspected the trees and the grounds, was held insufficient to rebut a presumption of negligence.

The Court in the Kenney case also quotes from *McCleod* vs. *Nel Co. Corp.*, 350 Ill. App. 216, 223, where plaster in a hotel room fell upon guests while they were sleeping, causing personal injuries:

"In 38 Am. Jurs. 1,003, title 'Res Ipsa Loquitur', Section 306, it is said that the doctrine has had frequent application in cases of injuries resulting from falling objects and substances; that, in order to invoke this doctrine in an action for injury from a falling object, the fall of the object must, according to common experience, be so unusual in occurrence, when due care is exercised by the defendant, as to carry inherent probability of negligence on his part."

In *Mertel* vs. *State of Illinois*, 21 C.C.R. 558, this Court allowed recovery for damage incurred by a truck when a bridge guard gate dropped on it, where the Court found no evidence in the record sufficient to rebut the presumption or inference of negligence raised by the application of the doctrine of *res ipsa loquitur*.

In the instant case, respondent has offered no evidence to rebut the presumption of negligence raised by the facts. There is no question but that the Del Mar target was under complete management and control of the agents of respondent, and that the target would not ordinarily drop off had respondent used proper care, thus bringing this case within the *res ipsa loquitur* doctrine.

In the opinion of this Court respondent is liable for the damages inflicted on the real and personal property of William and Frances Schwartz, and we accordingly award damages in the amount of $593.43 to the Standard Insurance Company of New York, and $129.90 to the Northwestern National Insurance Company of Milwaukee, Wisconsin.